(Del. Rev. 11/14) Pro Se Prisoner Civil Rights Complaint

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RECEIVED
DEC 23 2020
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Justin Erskine

_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

See Attached - "Defendants"
Claire DeMatteis, et al

_____

_____

*(In the space above enter the full name(s) of the defendant(s).
If you cannot fit the names of all of the defendants in the
space provided, please write "see attached" in the space
above and attach an additional sheet of paper with the full list
of names. The names listed in the above caption must be
identical to those contained in Section IV. Do not include
addresses here.)*

Civ. Action No. _____
(To be assigned by Clerk's
Office)

2 0 - 1 7 7 1

## COMPLAINT
*(Pro Se Prisoner)*

Jury Demand?
☑ Yes
☐ No

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from
public access to electronic court files. Under this rule, papers filed with the court should *not*
contain: an individual's full social security number or full birth date; the full name of a person
known to be a minor; or a complete financial account number. A filing may include *only*: the last
four digits of a social security number; the year of an individual's birth; a minor's initials; and
the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other
materials to the Clerk's Office with this complaint.**

(Del. Rev. 11/14) Pro Se Prisoner Civil Rights Complaint

## I.  COMPLAINT

*Indicate below the federal legal basis for your claim, if known. This form is designed primarily for pro se prisoners challenging the constitutionality of their conditions of confinement, claims which are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "Bivens" action (against federal defendants).*

Check one:

☑  42 U.S.C. § 1983 (state, county, or municipal defendants)

☐  Action under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971) (federal defendants)

## II.  PLAINTIFF INFORMATION

Erskine, Justin, P
Name (Last, First, MI)                                          Aliases

00414890
Prisoner ID #

Sussex Correctional Institution
Place of Detention

P.O. Box 500
Institutional Address

Sussex, Georgetown          Delaware          19947
County, City                State              Zip Code

## III.  PRISONER STATUS

*Indicate whether you are a prisoner or other confined person as follows:*

☐  Pretrial detainee
☐  Civilly committed detainee
☐  Immigration detainee
☑  Convicted and sentenced state prisoner
☐  Convicted and sentenced federal prisoner

(Del. Rev. 11/14) Pro Se Prisoner Civil Rights Complaint

## IV.  DEFENDANT(S) INFORMATION

*Please list the following information for each defendant. If the correct information is not provided, it could result in the delay or prevention of service. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.*

Defendant 1:  _See Attached. ~ "Defendants"_

Name (Last, First)

Current Job Title

Current Work Address

County, City                    State                    Zip Code

Defendant 2:  _____

Name (Last, First)

Current Job Title

Current Work Address

County, City                    State                    Zip Code

(Del. Rev. 11/14) Pro Se Prisoner Civil Rights Complaint

## Defendant(s) Continued

Defendant 3:

_____
Name (Last, First)

_____
Current Job Title

_____
Current Work Address

_____
County, City              State              Zip Code

Defendant 4:

_____
Name (Last, First)

_____
Current Job Title

_____
Current Work Address

_____
County, City              State              Zip Code

(Del. Rev. 11/14) Pro Se Prisoner Civil Rights Complaint

## V.    STATEMENT OF CLAIM

Place(s) of
occurrence:    *S.C.I. and J.T.V.C.C.*

Date(s) of occurrence:    *August 2019 through December 2020.*

State which of your federal constitutional or federal statutory rights have been violated:

*1st Amendment, 8th Amendment, 14th Amendment.*

*State here briefly the FACTS that support your case. Describe how each defendant was
personally involved in the alleged wrongful actions, state whether you were physically injured as
a result of those actions, and if so, state your injury and what medical attention was provided to
you.*

FACTS:    *See Attached - "Facts"*

| What happened to you? |
| --- |

(Del. Rev. 11/14) Pro Se Prisoner Civil Rights Complaint

_____

_____

## VI.    ADMINISTRATIVE PROCEDURES

*WARNING: Prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions. 42 U.S.C. § 1997e(a). Your case may be dismissed if you have not exhausted your administrative remedies.*

Is there a grievance procedure available at your institution?        ☑ Yes    ☐ No

Have you filed a grievance concerning the facts relating to this complaint?    ☑ Yes    ☐ No ✱
    If no, explain why not:

All remedies exhausted either by grievance, disciplinary appeal, or in-house letters (for officer misconduct, which is not grievable under DOC policy).

_____

_____

Is the grievance process completed?        ☑ Yes    ☐ No
    If no, explain why not:

_____

_____

_____

_____

_____

## VII.    RELIEF

*State briefly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.*

1) Grant injunctive relief to dismiss all write-ups.  2) Injunctive relief for professional accountability and/or termination.  3) Monetary damages for all constitutional violations.  4) Injunctive Relief against retaliation 5) Grant counsel - No access to law library due to COVID, only limited access under ordinary circumstances; limited legal knowledge.

(Del. Rev. 11/14) Pro Se Prisoner Civil Rights Complaint

## VIII. PRISONER'S LITIGATION HISTORY

*The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in forma pauperis in federal court if that prisoner has "on three or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. §1915(g).*

Have you brought any other lawsuits in state or federal court while a prisoner?        ☑ Yes   ☐ No

If yes, how many?  _____/_____

Number each different lawsuit below and include the following:

- Name of case (including defendants' names), court, and docket number
- Nature of claim made
- How did it end? (For example, if it was dismissed, appealed, or is still pending, explain below.)

- Gibbs V. John Carney, et al. C.A. No. 20-1301-CFC
- Class Action
- Active

(Del. Rev. 11/14) Pro Se Prisoner Civil Rights Complaint

_____

_____

## IX.   PLAINTIFF'S DECLARATION AND WARNING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; and (3) complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

*Plaintiff must sign and date the complaint and provide prison identification number and prison address.*

_____          _____
Dated                                     Plaintiff's Signature

*Erskine, Justin*
Printed Name (Last, First, MI)

*00414890*
Prison Identification #

*P.O. Box 500*          *Georgetown*          *DE*      *19947*
Prison Address          City          State      Zip Code

**Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.**

## Defendants

1) Delaware Department of Corrections ("DDOC")
2) DDOC Comissioner Claire DeMatteis
3) Sussex Correctional Institute (S.C.I.") Warden Truman Mears
4) S.C.I. Deputy Warden J. Beck
5) S.C.I. Sgt. Darrell Williams
6) S.C.I. Lt. James Chandler (retired)
7) S.C.I. Lt. Brett Hamstead
8) S.C.I. Sgt. Anthony Palo
9) James T. Vaughn Correctional Center (Jtvcc) C/o Dennis
10) J.T.V.C.C. Cpl. Amari-Brooks-Coleman
11) J.T.V.C.C. Lt. Kevin Lorick.
12) J.T.V.C.C. S. Lt. Orlando DeJesus
13) J.T.V.C.C. Lt. Richard Parsons
14) J.T.V.C.C. C/o Majca
15) J.T.V.C.C. Sgt. Snyder
~~xxxxxxxx xxxx xxxx xxxx~~
16) J.T.V.C.C. Lt. Hershman
17) S.C.I. Cpl. Ukee Johnson
18) S.C.I. Cpl. Kara Stanley
19) S.C.I. S. Lt. Matthew Long
20) S.C.I. Sgt. Kinsler

All Work titles are listed. Officers employed at J.T.V.C.C. have the following address: 1181 Paddock Rd, Smyrna, DE 19977.
All S.C.I. Employees have the following address: P.O. Box 500, Georgetown, DE 19947.

②

Commissioner DeMatteis's address is: 245 Mckee Rd, Dover, De, 18901.

Only Lt. James Chandler is not an active employee with DDOC.

## Facts

Beginning in August of 2019 and continuing to the present date, the Department of Corrections has committed several constitutional violations against me. These include retaliation of protected speech, false write-ups, violations of procedural and substantive due process in the disciplinary procedure, assault, retaliatory shakedowns, retaliatory false write-ups, entrapment, excessive punishment, deprivation of recreation/exercise, retaliatory visitation suspension, termination of employment, and movement of advantageous housing, all of which have created an atypical and significant hardship individually and collectively.

On 8/13/19, I received a false write-up from Corporal Darrell Williams (now sergeant). All of the details in the report are fabricated. It was my first day employed as a "cart-pusher," tasked with transferring a food cart from the kitchen to a separate building. I was an "extra," meaning I was not assigned a specific cart. I was instructed by the building officer, Dwayne Gray, to walk to the kitchen and make sure no carts were left over. While doing so, other prisoners were walking across the compound, and several prisoners were communicating. Cpl. Williams advised everyone to get their carts and/or get to their housing areas. I answered that I was an extra. Cpl. Williams told me "If you're an extra don't stand here," which I understood to mean that he did not want me communicating with the passing crowd of prisoners. I then moved away from that crowd. Cpl. Williams approached me, shouting that he "just told [me] not to do that." I tried to answer respectfully that I was following the directive of another officer and do my job. He kept yelling at me, not letting me speak, and ultimately telling me to go back to my housing area. I then told Cpl. Williams that I did not know why he felt it was appropriate to speak to me with such disrespect. He

then asked me for my ID and sent me back to my housing area. In his report, he alleged that he: 1) gave me a direct order to "get a cart and.. stop talking to those inmates." And also that I "refused twice." He says he asked me "Whats the problem?" and I "became disrespectfull (sic) and in a "loud (sic) tone Stated "i dont know why you are doing this." All of this is illogical.

The disciplinary (#24552) was presented to me by Lt. James Chandler at 4:40pm the same day. Lt. Chandler engaged me in conversation about the incident and I told him what transpired, stating clearly that Cpl. Williams lied in his report. This angered Lt. Chandler. He advised me that I would be having a hearing the next day, as I had not waived my 24-hour notice. But instead, the next evening, Lt. Chandler dropped off to the tier officer a report finding me guilty. I never had a hearing at all. I had a written witness statement and an argument in defense prepared, but I was unable to produce any of these.

I wrote to the warden about the issue. He, Warden Robert May, advised Lt. Brett Hamstead to look into it. I explained to Lt. Hamstead what happened, but I had already filed the appeal I requested to Lt. Hamstead that the write-up be thrown out because I was not given a hearing and because the reporting officer lied. On 9/7/19 Lt. Hamstead denied the appeal for the reason that the video footage, which did not have audio, shows me "arguing several times" with Cpl. Williams. That can not be deduced from the footage without hearing what is being said, but even if it could "arguing" is not a disciplinary infraction, nor does it meet the definition for either of the infractions - "Disrespect" and "Failing to Obey an Order."

On the same date that the disciplinary appeal was denied, officer Anthony Palo conducted a shakedown of my living area. He later admitted to me that Lt. Chandler had specifically instructed him to conduct this shakedown as retaliation.

At the time, I was housed in S.C.I.'s Merit Building, where restrictions on property are not enforced. Sgt. Palo confiscated a ring, a pen, and post-it notes. These items are not ever written up for contraband in the Merit building despite their being routinely possessed. Sgt. Palo reported giving Lt. Chandler the ring, which Lt. Chandler claims I did not possess upon arriving to S.C.I., which is false. Lt. Brett Hamstead approved the write-up. That evening I was moved out of Merit building. The write-up was not presented to me until 7 days later, in violation of DOC policy.

I was returned to Merit building 2 days later because someone recognized the inappropriate and retaliatory nature of the write-up and movement. On the day I was given the write-up, I was also found not guilty on the grounds that the write-up was retaliation (OR# 24733). My ring was never returned. This event establishes that coordinated retaliation does occur at S.C.I.

On March 17, 2020, I was working in the prison's laundry. There are roughly 15 prisoners or more who work in the laundry at a time. All of whom share one bathroom. On this day I went to use the restroom and discovered there was no toilet paper. I followed procedure and requested a roll of toilet paper from C/o Ukee Johnson, the supply officer. He responded that he "just gave you guys a roll. You're going to have to make that work," referring to the empty roll I brought to him. I then walked to my supervisor's office, Timothy Jones, to explain that I needed toilet paper. C/o Johnson saw this and began shouting expletives at me. He then approached me, aggressively shouted in my face, and pushed me into C/o Jones's office. This incident occured at the start of the COVID-19 pandemic when toilet paper was greatly commodified.

I reported this incident to Deputy Warden Beck and Warden Truman Mears. My friend also called the prison to report this assault. She was told



that there would be an investigation. Several prisoners witnessed the event, along with C/O Timothy Jones. Nobody contacted me about an investigation, though officer Johnson was seen pulling other inmate workers aside and questioning them in an effort to coerce them.

On July 7, 2020, I contracted COVID-19. On July 8, 2020, I was sent to JTVCC's COVID wing in Building 23. Upon arrival to this facility no orientation occured whatsoever. The officers working there were not in uniform. No rules were established whatsoever, and it was made clear on several occasions by several others, in no uncertain terms, that disciplinary infractions would not occur. This was supported by the myriad incidents, such as thefts, threats on staff, sexually explicit video visits, and other minor incidents that were not addressed with disciplinary action.

The Conditions at J.T.V.C.C and S.C.I were deplorable to the point where a friend of mine organized a citizen-lead protest against the treatment of prisoners and the conditions of their confinement at the facilities. That protest took place at S.C.I. on July 19, 2020. Another, at the governor's office, occured on or about August 8, 2020. It was common knowledge that my friend organized these demonstrations. At one point a C/O Dennis threatened to mace me about leaving my laundry on the floor, ostensibly in retaliation for these efforts.

Despite the moratorium on write-ups, on 8/17/2020 Cpl. Amari Brooks-Coleman issued a disciplinary to me. I was the first COVID inmate to be given a disciplinary at that point. The write-up was for having possession of a tablet device in my possession in my cell. These devices are issued by and property of DOC. Cpl. Brooks falsified several details in the



write-up, and even contradicted herself. I did possess a tablet — one that c/o Brooks herself failed to collect from me. Several incidents of due process violations occured during the hearing conducted by Lt. Kevin Lorick. It was clear, given that no write-ups had been conducted at this point, and that several other prisoners had done identical and more serious things, that the write-up was retaliatory, in addition to false, in addition to violating due process during the notification and hearing processes.

The following morning, on 8/19/20, I was awakened at 1:30 AM and presented with yet another write-up. This one was drafted by Staff Lieutenant Orlando DeJesus. It was for sexually explicit conduct during a video visit. Again, several prisoners were engaged in identical behavior. Nobody had been instructed against this or provided with rules. We were told no write-ups would occur. All in-person visitation was suspended, and we were in the midst of a global health pandemic. I was given this write-up at 1:30 AM, and Lieutenant Richard Parsons conducted the hearing an hour later at 2:30 AM. I requested, according to established federal guidelines that I be allowed to have my 24-hour notice. Lt. Parsons responded that it didn't matter if it was then or tomorow that he was going to find me guilty. DOC policy stipulates that incidents must be written up within 24 hours, and these incidents had occured several days prior. I wanted to review the rulebook to verify this. I was denied that right and found guilty on the spot.

I requested to see the inmate rule book from every officer who worked the building, but none was ever provided.

Despite still being under appeal from these two infractions, I was immediately sanctioned. These sanctions did not count toward the sanctions

⑥

imposed by the hearing officers. I was segregated, made to have "recreation" alone, given reduced recreation time, refused legal calls on several occasions by Sgt. Snyder, verbally harassed and berated, denied access to the tablets to communicate with my family, and was not allowed to talk to other prisoners. All of this occured without official sanctions. C/o Majea and Sgt. Snyder verbally abused and taunted me, and would shorten my recreation periods. Despite others committing the same actions, I was singled out for this treatment.

Later on, Major Jason Schaffer came to speak to me as a result of my friends and family calling the institution to inquire about my treatment. He informed me that Sgt. Snyder was concerned because she was responsible for keeping track of the tablet devices, but wasn't even aware how many there were, and it reflected poorly on her when it was discovered that several had not been accounted for. Many prisoners had stolen or kept tablets because none of us had access to incoming or outgoing mailers at all. During this time much of my personal mail was lost as well. I informed Maj. Schaffer of the violations of my due process rights in the disciplinary hearings. He promised to "look into it," but never did. He also did not in any way alter the retaliatory conditions under which I was housed, despite having the power to do so. I had been moved into a handicap-accessible cell because it was segregated from other cells; a handicap prisoner in a wheelchair had been moved out of that cell and into another non-handicap-accessible-cell in order to put me in the cell for punishment.

Due to the extreme deprivation of family contact in the COVID wing at J.T.V.C.C., it was routine for prisoners who were locked in their cells to have someone who was not locked in to call their families in order to communicate. The prisoner on recreation would use the locked-in prisoner's PIN # and make the

call. On 8/26/2020 ▓▓▓▓ another prisoner used my PIN# to make a telephone call. Again, no rules had been provided, and we were in the midst of a pandemic — communication was crucial to all parties. Nobody had been written up for this before. S.Lt. DeJesus was again monitoring my communication specifically, and he issued a write-up for this. (Q&A # 125428) I never received a hearing or disciplinary infraction for this write-up, but it does establish a pattern of retaliation and harassment by DOC staff, and particularly by S.Lt. DeJesus.

On 9/9/2020, S.Lt. DeJesus wrote me up again. The day before, he unilaterally decided to remove 3 phone numbers from my allowed call list. No other prisoner had this happen to them. These were people I call on a daily basis. I called them on 3-way to let them know that their numbers had been removed. I had no way of writing or messaging them because we had no mail at the time. Also, 3-way calls are routine. Nobody is written up for them. And I was not provided rules stating that they were a violation. At the hearing several due process violations occurred. I was not given counsel per my request, and the hearing took place, by Lt. Hershman, prior to 24 hours of being notified of the disciplinary. I confronted S.Lt. DeJesus and addressed the retaliation. He admitted spending several hours a day listening to my calls; at this point I was now being permitted more telephone access. There was no legitimate security interest in doing so and he could not explain why he was doing so, even though retaliation was relevant to the hearing process. The hearing officer was not impartial, as he is a childhood friend of my uncle's and had been rejected romantically by my mother. I was never permitted to appeal this disciplinary because I was returned to S.C.I. I did serve two sanctions in the COVID unit, which was cruel and unusual, given the lack of mail or

any outside communication.

When I returned to S.C.I. I was made to finish a sanction from J.T.V.C.C. Another prisoner, Shanar Walker, returned to S.C.I. with a sanction from J.T.V.C.C. but he was not made to serve out that sanction at S.C.I.

~~On 10/20/2020, at approximately 5:00pm, I was having a phone call with the~~

Once I was back at S.C.I., I attempted to have a visit with Heather Morris, the friend who had staged the protests, and also the woman I was written up for having a sexually explicit video visit with. She was permitted to schedule two visits for Oct 11 and Oct 18. When she arrived on Oct. 11, she was told that she was banned until Oct. 28. She then scheduled a visit for after that date. On Oct 24. Ms. Morris attended a protest with Claire DeMatteis's sister-in-law. Claire DeMatteis and Ms. Morris had an in-person meeting in July, where Commissioner DeMatteis was alerted to the issues surrounding CARS in the prisons. Mrs. DeMatteis denied those issues were occuring and was demeaning. Once the retaliation began at J.T.V.C.C., Commissioner DeMatteis directed all of the administration at J.T.V.C.C. to not speak to Ms. Morris at all. So, on the day that Ms. Morris and Kathy DeMatteis, then a candidate for Delaware Governor, attended a protest together, I was called to Staff Lieutenant Hanna's office. Ms. Morris and I had been discussing the protest on the prison telephone hours earlier. S.Lt. Hanna advised me that a "mistake" had been made, and that Ms. Morris was banned from entering the prison and having video visitation/tablet communication for "3 years, not 3 months." If that suspension had been implemented at the time of the write-up for the sexually explicit video visit (8/19), then Oct 28 would have not been 3 months. Thus, such a mistake would be very unlikely. When considering that Ms. Morris and Kathy DeMatteis, whom

Commissioner DeMatteis detests, had spent the day protesting prison issues together, this becomes highly suspicious. Other civilians were surrendered for far less time, despite more egregious behavior.

Five days later, on Oct 29, the building I was housed in was restricted to just 3 calls a day when there had previously been no limit. Naturally, everyone was upset because there was no in-person visitation again due to COVID, and the tablets had just been introduced to that building, meaning there would be much less demand for the phones, meaning less conflict, meaning no reason to restrict calls while the DOC was publicly stating how they were expanding family contact. Ms. Morris and I were discussing potential avenues of recourse, such as another citizen-led protest, or even litigation. Again, over the prison phone.

The following day, on Oct 30, a team of 5 officers came to the building I was housed in, Merit Building, came directly to my cell, and detained me there. Staff Sergeant Baroudakis informed me that they had "been instructed to come shake [me] down." He proceeded to strip search only me; my cellmate was not strip searched. It's noteworthy that my cellmate is blind, and I was hired to be his live-in caregiver. During the shakedown almost all of my personal photographs were confiscated (over 1,000 of them). I was written up for a plethora of minor "Contraband" items, much of which was not mine, or was used to properly store and secure items in such a way that my recently-blind cellmate could identify and/or avoid as a hazard. Some items, such as the photos and pens, were not even contraband (Del#26494). Nearly all of the items had just been inventoried and then given to me upon my return from the COVID unit.

When I informed Ms. Morris of what had occured, she called the prison to find out why I was being targeted and harassed. Again, I lived in a privileged building where these items would have not been given a second

glance, and in fact were not given any scrutiny by the regular tier officers. Ms. Morris was advised by DOC personnel that the Bureau Chief, Warden, Deputy Warden, and Security Superintendant were all in a meeting, discussing the matter.

I was written up by Corporal Kara Stanley. All offenses were considered minor, Class 2, offenses, but the write-up was upgraded to a Class 1. I requested counsel for an investigation, but none was given, and I requested witnesses of S.Sgt. Baroudakis, Major Marvella Wise, Deputy Warden Beck, and Warden Mears. I informed the hearing officer, Staff Lieutenant Matthew Long that I wished to have these witnesses. I explained that I wished to establish that the shakedown was targeted and retaliatory in that it had no legitimate security interest. S. Lt. Long then proceeded to offer testimony that it was not targeted, that the shakedown was "random." I told S. Lt. Long that S. Sgt. Baroudakis told me otherwise. He became agitated and dismissed me.

At the hearing, a few days later, only Cpl. Stanley was present. I advised S. Lt. Long that I wished to establish retaliation, and asked that if I could do so would he be willing to find me not guilty. He answered that he would not find me not guilty. I then proceeded under protest. Cpl. Stanley immediately lied, saying the shakedown was random and part of a training exercise. I could not prove the lying because my witness was not present. The hearing officer was not impartial, and the process violated several due process rights. I appealed on several grounds, most of which were ignored, and a sanction was imposed.

Retaliation continued in other ways. The building sergeant, Kinsler, began propagating that I was not doing my job duties, despite vehement insistance from Abdul-Haqq Shabazz, my blind cellmate, that I worked with him consistently. He harassed me over that. He refused simple tasks, like ordering me work boots.

⑪

He complicated matters for Mr. Shabazz, by trying to prevent anyone else aside from me, and another prisoner who was assigned to provide assistance, from helping him with anything. His propaganda seemed to be effective, because on Nov. 21, 2020 I received another false disciplinary write-up.

On this day, C/O Richard Deputy was working the tier. Another prisoner and I were on the tier having a conversation within earshot of C/O Deputy. C/O Deputy began yelling at us and swearing. He and the other prisoner had some dialogue. I then suggested to C/O Deputy that if he took issue with the conversation he could simply ask us to quiet down. This request is in keeping with DOC policy that prisoners be treated respectfully and humanely. C/O Deputy responded by using expletive name-calling toward me. As I tried to reiterate that I merely wished to be spoken to "with respect, like a human," C/O Deputy started shouting at me and approaching me aggressively. To deescalate the encounter, I asked for C/O Deputy's full name, and wrote it down. He responded by ordering me to lock in. I immediately obeyed and began moving toward my cell, stopping only to reply to C/O Deputy's continual menacing dialogue. He then issued a false write-up, given to me the next day, claiming that I made threats toward him.

I requested two witnesses and staff counsel for an investigation. Captain Hickman did an investigation, and discovered that I did obey C/O Deputy's order. My witnesses however were called outside my presence, and interrogated with questions that I would not have asked and did not have an opportunity to mitigate. C/O Deputy gave false testimony at the hearing, which was exposed by Captain Hickman. He also admitted to escalating the encounter. Again, S.Lt. Long was the hearing officer. He did not himself review the video footage of the incident. When I tried to present my case he was again verbally abusive. He equated my line of questioning with

⑫

"thinking [I] run things." He then found me guilty of failure to obey an order, a minor infraction, and sanction me for 5 days of solitary confinement, and 40 days of lost privileges.

I elected to appeal. The appeal was due on Dec. 10, 2020. I gave the appeal to C/o O'Niel on Dec. 10, 2020, per policy. C/o O'Niel dated the appeal and submitted it. However, S.Lt. Long ignored the receipt of this appeal and incorporated sanctions without producing the appeal for the consideration of the Commissioner, per DOC policy. I requested to speak with S.Lt. Long's superior, but was denied the chain of command by Sgt. Johnston. Sgt. Johnston said she would ask C/o O'Niel if he would contact a captain, but the following day C/o O'Niel reported to me that Sgt. Johnston never did so. The sanction began on Dec. 11, 2020.

On Nov. 24, 2020, I was moved out of the Merit Building, despite being classified to Merit, and over the objection of the classification staff. I was also terminated from my job as a result.

On Nov. 25, 2020, because the building I was newly housed in does not permit possession of appliances, I had to send my TV, radio, and fan to be stored in property. Property officer Richard Donovan received my property. He claims to have checked the DACS System, and noticed that my radio was not the radio on file, and concluded that I bartered for it. He then wrote me up for bartering. I came to this prison with that radio. Cpl. Donovan himself returned it to my possession 2 months prior. I was able to produce the paperwork that proved this, and the write-up was disposed as Not Guilty. However, I was then told I had to get rid of my radio, even though I'd been permitted to have it for the 20 months I had been in this prison because I bought it at J.T.V.C.C. several years ago and arrived at S.C.I. with the radio.

Prior to leaving the Meat Building, the investigative team at S.C.I., consisting of Staff Lieutenant Dean Blades, Sgt Runne, C/o Madigan, and Staff Sergeant Hubbs, summoned my cellmate, Abdul-Haqq Shabazz, under the guise of taking him to an outside medical appointment. Mr. Shabazz has several health complications in addition to his blindness, and was eager to have medical attention. However, when they took him from the building in his wheelchair, it was not to go to a medical appointment. Instead, they took him to be questioned about me. As previously mentioned, I was assigned to assist Mr. Shabazz with daily prison activities, one of which was to help him access the tablet devices. I had done so several times, so that he could listen to music and message friends. They interrogated him for over an hour after he established that nothing questionable or nefarious was occurring. They were inquiring if I was using his account against his will or taking advantage of him. He continued to insist that this was not the case, yet they were relentless. In keeping with the rest of their underhanded methods, the DOC was doing anything in their power to cause me trouble and hardship. Their lack of success in this instance did not deter them from continuing to try to find any reason to write me up or harass me

Conclusion on Back

The onslaught of retaliation, due process violations, Cruel and unusual punishment, violations for participating in protected speech, and general indifference and mistreatment has exceeded an atypical and significant hardship. It has damaged my personal relationships, damaged my likelihood of receiving a commutation, degraded me, caused extreme stress and mental anguish, deprived me of a fulfilling job aiding a prisoner in need, deprived me of advantageous housing, violated my rights to equal protection under the law, attacked me for my personal/political views, which are liberal and unpopular among prison staff, and have tarnished my ability to live with reasonable ease as I pursue my college degree, Institutional programs, and interactions with staff and prisoners at this facility.

Justin Erskine, 414850
P.O. Box 500
Georgetown, DE 19947



FILED

DEC 2 3 2020

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Clerk U.S. Dist. C. Del
Lockbox 18
844 N. King St.
Wilmington, De 19801

Justin Eatose BLDG. S-23
SEX CORRECTIONAL INSTITUTION
BOX 500
RGETOWN, DELAWARE 19947